### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| ANDREW PAUL MANARD, individually, and on behalf of himself and all others similarly situated, | ) ) ) ) |
| *Plaintiff,* | ) No. _____ ) ) |
| v. | ) ) **Jury Trial Demanded** |
| KNOLOGY, INC. a Delaware Corporation, | ) ) ) |
| *Defendant.* | ) ) |

## CLASS ACTION COMPLAINT

Plaintiff, Andrew Paul Manard ("Plaintiff"), on behalf of himself and all others similarly situated (the "Class" and each a "Class Member"), by and through his attorneys, KamberLaw LLC, Panish, Shea & Boyle, LLP, the Law Office of Joseph H. Malley, P.C., and Parisi & Havens LLP, as and for Plaintiff's complaint and demanding trial by jury, allege as follows upon personal knowledge as to himself and his own acts and observations and, otherwise, upon information and belief based on the investigation of counsel and which Plaintiff believes further investigation and discovery will support with substantial evidence.

## NATURE OF THE CASE

1.      In early 2008, cable-based Internet service provider Knology, Inc. ("Knology") began installing spyware devices on its broadband network.  The devices funneled all affected users' Internet communications—inbound and outbound, in their entirety—to a third-party Internet advertisement-serving company, NebuAd.

2.      NebuAd and Knology used the intercepted communications to monitor and profile individual users, inject advertisements into the web pages users visited, transmit code that caused

undeletable tracking cookies to be installed on users' computers, and forge the "return addresses" of user communications so their tampering would escape the detection of Users' privacy and security controls.

3.      Historically, "spyware" is a term that has been applied to software installed on users' personal computers. The ISP-based spyware provided by NebuAd and deployed by Knology represented a radical innovation. In the context of Knology's role as the trusted conduit for all its users' Internet communications, this ISP-based spyware created an unprecedented, extraordinarily pervasive ability to monitor users, identify particular individuals, and tamper with their communications and personal computers—even when those users were interacting with websites with which neither Knology nor NebuAd had any relationship.

4.      Initially, Knology provided absolutely no notice or request for consent from its users to install the Appliances.  Only after everything was up and running for over a month did Knology made a modification to its Customer Service Agreement which still did not accurately disclose the scope of its spyware-based activities and their impact on its users and did not obtain consent from affected users or the opportunity to opt out.  Similarly, Knology provided misleading statements in response to Congressional inquiries about its relationship with NebuAd..

5.      Knology did it for the money. For a price per customer per month, Knology exploited its trusted position as a carrier for users' private communications, selling its unique ability to access users' Internet traffic and transmit communications to their personal computers. As to the effects of Knology's conduct on users' privacy, their personal computers, and Knology's quality of service, Knology left users to fend for themselves. Accordingly, Plaintiff, on behalf of himself and all other similarly situated Knology users, now seeks the relief requested in this complaint.

## PARTIES

6.     At all times relevant to this complaint, Plaintiff Andrew Paul Manard was a citizen and resident of Muscogee County, Georgia, a subscriber to Knology's broadband Internet services, and therefore a User, as defined herein.

7.     At all times relevant to this complaint, Knology, Inc, a Delaware corporation doing business under names that included "Knology Broadband, Inc," and "Knology of Georgia, Inc." ("Defendant" or "Knology"), was a commercial provider of high-speed, broadband Internet services to customers in and about Georgia, Alabama, Florida, Tennessee, South Carolina, Iowa, Minnesota, and South Dakota, including the areas of West Point, Georgia; Columbus, Georgia; Augusta, Georgia; Panama City, Florida; Knoxville, Tennessee, and Huntsville, Alabama. Knology is headquartered in Georgia.

a.     Knology provided Internet services to approximately 200,000 customer accounts, including Plaintiff, who accessed the Internet using Knology-supplied modems connected to their personal computers. Since a given customer account was often utilized for Internet access by multiple consumers, such as members of the account-holder's household, the actual number of consumers using Knology's ISP services ("Users") was much higher than 200,000.

b.     As an Internet Services Provider ("ISP") providing broadband Internet services to the consuming public, Knology was a "provider of an electronic communications service" as defined in the Electronic Communications Privacy Act, Title 18, United States Code, Section 2510(15) (the "Wiretap Act").

c.     Users' Internet communications transmitted by Knology consisted of the transfer of data transmitted in whole or in part by wire, radio, electromagnetic, photoelectronic, or photooptical systems that affected interstate and/or foreign commerce and were therefore

3

"electronic communications" as defined in the Wiretap Act, Title 18, United States Code, Section 2510(12).

d.    Knology Users were persons or entities who used Knology's electronic communications services, were duly authorized by Knology to engage in such use, and were therefore "users" as defined in the Wiretap Act, Title 18, United States Code, Section 2510(13).

e.    The personal computers of Knology Users were computers used in and affecting interstate commerce and communication and were therefore "protected computers" as defined in the Computer Fraud and Abuse Act, Title 18, United States Code, Section 1030(e)(2).

### JURISDICTION AND VENUE

8.    This Court has original jurisdiction over this action pursuant to Title 28, United States Code, Section 1331, arising from the federal causes of action set forth in this complaint.

9.    This Court has subject-matter jurisdiction over this action pursuant to Title 28, United States Code, Section 1332 in that the aggregate claims of Plaintiffs and the proposed Class Members exceed the sum or value of $5,000,000.

10.    There is minimal diversity of citizenship between proposed Class Members and Defendant in that Defendant is a Delaware corporation headquartered in Georgia with customers in Georgia, Alabama, Florida, Tennessee, South Carolina, Iowa, Minnesota, and South Dakota, and Plaintiff is a citizen and resident of the State of Georgia asserting claims on behalf of a proposed class whose members reside in Georgia, Florida, Tennessee, Alabama, and South Carolina.

11.    This Court has personal jurisdiction over Defendant because: (a) Defendant maintains offices and/or facilities in the State of Georgia; (b) a substantial portion of the wrongdoing alleged in this complaint took place in this State; and (c) Defendant is authorized to do business in and has sufficient minimum contacts with this State and/or has otherwise intentionally availed itself of the markets in this State through the promotion, marketing, and sale of its products

and/or services in this State, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.    Venue is proper in this District under Title 28, United States Code, Sections 1391(b) and (c), in that Defendant conducts business with consumers in this District, and a substantial portion of the events and conduct giving rise to the violations of law set forth in this complaint took place in this District.

## CONDUCT COMPLAINED OF

### A.    Knology's Deployment of Appliances

13.    An ISP is a conduit. Its job is to provide users with a connection to the Internet so users can communicate with other Internet-connected parties. Through the ISP's services, users browse websites, engage in e-commerce, hold voice-over-Internet-Protocol (VoIP) conversations, exchange e-mail correspondence, instant messages, and "tweets," and otherwise use the ISP's services to conduct all their Internet activities.

14.    In or about late 2007 or early 2008, Knology entered into an agreement with NebuAd, Inc. ("NebuAd"), a "third party provider of tailored advertising services." The devices were activated in early 2008. Knology has acknowledged that it engaged NebuAd and participated in serving advertisements to its Users. (*See* Letter from Rodger L. Johnson to the Hon. John D. Dingell, Chairman, Committee on Energy and Commerce, United States House of Representatives, Aug. 8, 2008, p. 1, *http://energycommerce.house.gov/Press_110/Responses%20to%-20080108%20TI%20Letter/110-ltr.080108responseKnology.pdf*; hereinafter, "Knology Resp. to

Congress.") Knology has further acknowledged that the ad-serving model included monitoring and analyzing of its Users' Internet communications. (*See* Cal. Mtn. Dism. p. 4:1-2.[1])

15.    NebuAd agreed to share with Knology the revenue from serving advertisements to Knology Users, paying Knology based on the number of subscriber accounts, per month, whose communications Knology diverted to the Appliances.

16.    Knology's and NebuAd's actions set forth in this complaint were undertaken by Knology and NebuAd in the performance of their respective obligations under their agreement.

17.    On NebuAd's website at *http://www.nebuad.com*, it provided the following overview of its business model:

> Through its unique technology and methodology, industry expertise, and ISP partnerships, NebuAd is leading the industry to a new level of advertising effectiveness. NebuAd combines web-wide consumer activity data with reach into any site on the Internet. The result is vastly more data and relevance than existing solutions that are limited to one network or site.

18.    NebuAd's ad-serving model relied on its gaining direct access to Users' Internet communications en route to and from Users' personal computers. To accomplish this, Knology licensed and installed the NebuAd Ultra-Transparent Appliance (the "Appliance") from NebuAd and deployed Appliances in a number of Defendant's broadband service network locations.

19.    Knology began installing Appliances in its broadband networks beginning in or about early 2008.

20.    With NebuAd's cooperation, Knology deployed each Appliance by physically situating it within Knology's existing network infrastructure, reconfiguring its network to recog-

---

[1] "Cal. Mtn. Dism." refers to Defendants Knology and WOW's Motion to Dismiss (DKT. 51), *Valentine v. NebuAd*, No. 3:08-cv-05113 (TEH) (N.D. Cal.), in a suit brought against NebuAd and a number of its ISP clients. In that case, on October 6, 2009, the Court dismissed the claims against Knology and other defendant ISPs on grounds of lack of personal jurisdiction. (*Id.*, DKT. 166.) Knology's motion to dismiss is cited herein as "Cal. Mtn. Dism. p. [*page*]:[*line numbers*]."

nize the Appliances as a networkdevices, and configuring its network connections to funnel all User Internet activity through the Appliances.

21.    In the operation of the Knology-NebuAd relationship, Knology was responsible for installation of the Appliances; maintaining the flow of Users' Internet traffic to the Appliances; and, subsequently, resuming the handling of intercepted communications by delivering them to their destinations. Knology supported the continued operation of the Appliances by providing ongoing network environment resources and services.

22.    By early June 2008, Knology and NebuAd had installed Appliances throughout Knology's Southeastern ISP networks, served by its locations in Alabama, Georgia, Florida, Georgia, South Carolina and Tennessee.

23.    Owing to Knology's unique position as an ISP for a large consumer population, it was able to divert Internet traffic on a massive scale. Assuming a single User from each of approximately 200,000 customer accounts visited one website per day during a seven-month period, the number of diverted incoming and outgoing communications would exceed 42 million.

24.    Knology claimed to have terminated its use of the Appliances in July, 2009. (*See* Knology Resp. to Congress, p. 2.)

**B.    Interception and Use of Personally Identifiable Information**

*Interception of Users' Electronic Communications*

25.    The scope Knology's indiscriminate diversion of Internet traffic to the Appliances encompassed all of its Users' web navigation activity and other Internet transactions, such as file downloads and inbound and outbound messages—all unfiltered, in their entirety. The communicative components of User traffic diverted to the Appliances necessarily included:

        a.    all communications protocol types, including web communications (*http* traffic); encrypted web communications (*https* traffic); e-mail communications, including web-

7

based email communications (*e.g.*, GMail, Hotmail, and Yahoo email account traffic); instant messages; file transfer protocol (*ftp*) and secure file transfer protocol (*ftps*) downloads; and voice-over-Internet-Protocol (VoIP) telephony communications;

  b.  all navigation information, including Users' search terms and the universal resource locators (URLs) identifying websites and Internet addresses accessed by Users;

  c.  Internet Protocol (IP) addresses, which uniquely and persistently identified Users' specific personal computers, in that Users generally leave their cable modems in an always-on state, causing Users' personal computers to remain linked to unique, "sticky" IP addresses, much like static IP addresses;

  d.  personally identifying information[2] and substantive content in communications relating to personal and sensitive matters such as health events, insurance coverage, financial and e-commerce transactions, financial account status details, credit reports, political activities and interests, personal relationships and dating, job searches, and movie rental choices; privileged correspondence such as marital and attorney-client communications; and information contained in the financial records of financial institutions, of card issuers, as defined in Title 15,

---

[2] The Federal Trade Commission has defined "personally identifiable information" or "personal information" as:

> individually identifiable information from or about an individual [consumer] including, but not limited to: (a) a first and last name; (b) a home or other physical address, including street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name that reveals an individual's email address; (d) a telephone number; (e) a Social Security Number; (f) a persistent identifier, such as a customer number held in a "cookie" or processor serial number, that is combined with other available data that identifies an individual; or (g) any information that is combined with any of (a) through (f) above.

*In the Matter of Microsoft Corporation*, Federal Trade Commission, File No. 012 3240, Docket No. C-4069, Agreement Containing Consent Order, Aug. 8, 2002, pp. 2-3, *http://www.ftc.gov/os/caselist/0123240/microsoftagree.pdf*; *accord In the Matter of Eli Lilly and Company*, Assurance of Voluntary Compliance and Discontinuance, Attorneys General of the States of California, Connecticut, Idaho, Iowa, Massachusetts, New Jersey, New York, and Vermont, p. 7 n.3, *http://supplierportal.lilly.com/Home/Multi_State_Order.pdf* and *http://epic.org/privacy/medical/lillyagreement.pdf*.)

United States Code, Section 1602(n), and from the files of consumer reporting agencies on consumers, as defined in the Fair Credit Reporting Act, Title 15, United States Code, Section 1681, *et seq.*; and

        e.      information to, from, and about children under the age of 13.

26.     NebuAd confirmed that it received unfiltered Internet traffic when it stated in Congressional testimony that "the NebuAd service constructs anonymous inferences about the user's level of qualification for a predefined set of market segment categories, *and then discards the raw data* that was used to create or update a user's anonymous profile." (*See* Testimony of Bob Dykes, CEO, NebuAd, Inc., Senate Committee on Commerce, Science and Transportation, "Privacy Implications of Online Advertising," July 9, 2008, p. 6, *http://commerce.senate.gov/public/_files/RobertDykesNebuAdOnlinePrivacyTestimony.pdf*, emphasis added; hereinafter, "Dykes Senate Testimony.") Thus, when NebuAd's CEO testified that "NebuAd's ad optimization and serving system does not collect PII or use information deemed to be sensitive (e.g., information involving a user's financial, sensitive health, or medical matters)," he was not denying NebuAd's acquisition of such information, merely claiming that NebuAd did not utilize such information to select and deliver advertisements. (*See id.*, p. 4.)

27.     Further, Knology admitted that NebuAd assumed control of User information diverted to the Appliances. (*See* Cal. Mtn. Dism. p. 4:8-10.) NebuAd confirmed this in testimony before Congress when it described "the NebuAd advertising service—part of which is co-located with, but operates separate and apart from, an ISP's facilities." (*See* Testimony of Bob Dykes, CEO, NebuAd, Inc., House Subcommittee on Telecommunications and the Internet, "What Your Broadband Provider Knows about Your Web Use: Deep Packet Inspection and Communications Law and Policies," July 17, 2008, p. 4, *http://energycommerce.house.gov/images/stories/Docu-*

*ments/Hearings/PDF/Testimony/TI/110-ti-hrg.071708.Dykes-testimony.pdf;* hereinafter, "Dykes House Testimony.")

28.   In light of the foregoing admissions, Knology misrepresented the content of User traffic it diverted to NebuAd when it represented to a Congressional committee that NebuAd collected no personally identifiable information. (*See* Knology Resp. to Congress, p. 1.)

29.   Similarly, Knology misrepresented the scope of User traffic it diverted to NebuAd when it stated to a Congressional committee, "Knology did not provide NebuAd access to any customers' personal information." (*See* Knology Resp. to Congress, p. 1.)

30.   In light of the foregoing:

a.   The Appliances were devices used to acquire the "contents" of communications, as that term is defined in the Wiretap Act, Title 18, United States Code, Section 2510(8), in that Knology used the Appliances to divert and transfer the substance, purport, and meaning of the communications to the Appliances. Therefore, the Appliances were used to "intercept" the contents of electronic communications, as that term is defined in the Wiretap Act, Title 18, United States Code, Section 2510(4);

b.   Each Knology network or network segment incorporating Appliances into their routine operations were devices and apparatuses that could be and were used to intercept, retain, and transcribe in-transit electronic communications and were therefore "electronic, mechanical, or other devices" as defined in the Wiretap Act, Title 18, United States Code, Section 2510(5).

c.   Likewise, each Appliance was itself a device and apparatus that could be and was used to intercept, retain, and transcribe in-transit electronic communications and was

therefore an "electronic, mechanical, or other device" as defined in the Wiretap Act, Title 18, United States Code, Section 2510(6).

31.    Neither Knology nor NebuAd was the originator or recipient of the User communications traversing Knology's networks and, as further detailed in section E, "Knology's Deception and Lack of Authorization," below, neither Knology nor NebuAd was authorized to intercept and read the contents of Users' communications. Therefore, neither Knology nor NebuAd was a "party" to Users' electronic communications, as that term is used in the Wiretap Act, Title 18, United States Code, Section 2511(2)(d).

32.    Knology's interception and eavesdropping was intentional and knowing in that it was undertaken by Knology in the performance of its agreement with NebuAd and accomplished with instrumentalities that included the Appliance and Knology's networks installed and configured specifically to perform interception and eavesdropping.

*Tracking and Profiling of Individually Identified Users*

33.    Regardless of whether NebuAd eventually discarded the personally identified content in Users' "raw data," it identified individual users and maintained behavioral profiles on them. NebuAd's profiles were linked not just to individual personal computers, but to the particular users, themselves.

34.    To obtain information for NebuAd's behavioral profiles of Users, the Appliance included deep packet inspection ("DPI") functions that read and analyzed Users' communications. DPI software enables a party to read the contents OSI layers 6 and 7 of the data packets comprising an Internet communication—which is to say that DPI looks past the "envelope" and "handling instructions" layers of an Internet communication and drills down to transcribe the payload—the actual substance intended to be read by the recipient of the communications.

35.    In addition, despite NebuAd's claim that "[t]here is no connection or link between the ISP's registration data systems and NebuAd" (*see* Dykes Senate Testimony, p. 7), NebuAd's user profiles included Users' five-digit zip codes, which it either deduced from Users' Internet communications or received from Knology.

36.    Through NebuAd's identification of individual Users and Knology's interception of all of its Users' Internet communications, NebuAd could claim, "[W]e're able to get a 360-degree, multidimensional view over a long period of time of all the pages users visit." *Behavorial Insider*, Nov. 14, 2007, *http://publications.mediapost.com/index.cfm?fuseaction=Articles.showArticle&art_aid=71020*.

37.    The relationship between Knology and NebuAd represented an unprecedented and extraordinarily pervasive ability to locate and monitor Users and—as discussed below in section C, "Tampering with User Communications and Computers"—control Users' communications in all of their Internet activities. This ability to identify individuals and intervene in their communications extended to Users' interactions with websites with which neither Knology nor NebuAd had any relationship.

38.    The unique and persistent identifiers NebuAd used to track Users and link their online behavior to its profiles constituted personally identifying information, just as a telephone number constitutes personally identifying information used to contact an individual, a street address constitutes personally identifying information used to find or correspond with persons residing at that address, or a global positioning system (GPS) signal constitutes personally identifying information used to locate the GPS device user while in transit. Therefore, Knology's statement to a Congressional committee that NebuAd used no personally identifiable information was a misrepresentation. (*See* Knology Resp. to Congress, p. 1.)

## C.    Tampering with User Communications and Computers

39.    NebuAd and the Appliance used DPI not only to read the contents of Users' communications, but to alter the contents, load the communications with atypically persistent tracking cookies, and forge components of the communications to evade Users' security and privacy controls when Knology ultimately delivered the communications to Users, as follows:

a.    For a communication en route to a User, if NebuAd identified the opportunity to serve a targeted advertisement, the Appliance inserted the advertisement into the web page being downloaded for display to the User.

b.    The Appliance also inserted Javascript program code to be executed on the User's personal computer. Upon reaching Users' personal computers, the code forced Users' computers to download cookies from a NebuAd division. Causing Users' computers to contact a third-party website not authorized by the original web page the User downloaded violates Internet Engineering Task Force (IETF) standards designed to maintain the security and integrity of Internet communications. Further, the cookies that the code caused to be deposited on Users' computers were no ordinary cookies that Users could manage with their privacy controls. They were super-persistent cookies that, if removed, simply reappeared. NebuAd's CEO alluded to this fact in testimony before Congress when he stated, "NebuAd has enhanced the industry-standard opt-out "cookie" based system with the use of proprietary techniques. This enables the opt-out to be more persistent." (Dykes Senate Testimony, p. 4 n.4.)

c.    The Appliance forged the "envelope" of the altered communication to make the communication appear to the User's personal computer as if it were the authentic and unaltered web page the User had requested, thus escaping detection by Users' security controls designed to protect against unauthorized third-party content.

d.    Knology then delivered the altered, loaded, forged communications to the User's personal computer.

40.    The Appliance's functions were consistent with NebuAd's March 30, 2007 patent application for "[a] network device for monitoring data traffic between a client device and a server device," which stated:

> The data packets exchanged between a computer and a website being visited are altered or modified in such a way that the head of the packets remains largely intact while the payloads of the packets are changed to suit the need.

(See U.S. Patent Application No. 11693719, "Network device for monitoring and modifying network traffic between an end user and a content provider," filed Mar. 30, 2007, Abstract, Summary ¶¶ 9-10, Claims ¶¶ 4, 8, 12-14, 16; see also U.S. Patent Application No. 11759157, "Method and system for inserting targeted data in available spaces of a webpage," filed June 6, 2007; U.S. Patent Application No. 11759179, "Network device for embedding data in a data packet sequence," filed June 6, 2007; U.S. Patent Application No. 11759187, "Network devices for replacing an advertisement with another advertisement," filed June 6, 2007.)

41.    The content modification, forgery, and tracking code behavior of the Appliance implemented by Knology was independently documented in "NebuAd and Partner ISPs: Wiretapping, Forgery and Browser Hijacking" by Robert M. Topolski, co-published by Free Press and Public Knowledge, June 18, 2008, http://www.freepress.net/files/NebuAd_Report.pdf; http://www.publicknowledge.org/pdf/nebuad-report-20080618.pdf.

42.    As further detailed in section E, "Knology's Deception and Lack of Authorization," Knology did not have authority to access Users' personal computers and/or Knology exceeded what authority it had to access Users' personal computers in that Knology was not authorized by its Users to transmit altered and forged communications that avoided detection and rejec-

tion by Users' security controls and that caused the transmission and execution of code that defeated Users' privacy and security management tools.

43.     Knology's access of its Users' personal computers was knowing and intentional and Knology was aware of and intended the natural and probable consequences of such conduct, inasmuch as Knology acted in concert with NebuAd and its actions were undertaken pursuant to an agreement between Knology and NebuAd to engage in just such conduct.

44.     Knology knowingly caused the transmission of programs, information, codes, and commands in that Knology transmitted forged communications designed to avoid detection by Users' security controls, and Knology transmitted commands and code that created persistent tracking cookies on Users' personal computers, which were protected computers, defeating Users' privacy management tools.

**D.      Knology's Abnormal Course of Business and Unnecessary Conduct**

45.     Knology's acts alleged in this complaint far exceeded the scope of the "ordinary course of business" as that phrase is used in the Wiretap Act, Title 18, United States Code, Section 2510(5)(a) and the "normal course of [Knology's] employment while engaged in any activity which is a necessary incident to the rendition of [its] service or to the protection of the rights or property of the provider of that service" as that phrase is used in the Wiretap Act, Title 18, United States Code, Section 2511(2)(a)(i).

46.     It was not in Knology's normal course of business to engage in or facilitate User monitoring and behavioral profiling, advertisement selection, and advertisement delivery—whether by inserting ads into web content being downloaded by Users or by any other means.

a.      Prior to Knology's relationship with NebuAd, it did not deliver targeted advertising to its users.

b.      Knology has characterized its foray into profiling and ad distribution with NebuAd as "brief" (Cal. Mtn. Dism. p. 3:6-7.) Since Knology's termination of its NebuAd relationship, Knology has been able to continue providing Internet services to its Users and has not found that it must engage in online ad-serving to be capable of providing such services.

c.      Therefore, consumer profiling and ad selection and delivery were not activities Knology conducted in the normal course of its business or as necessarily incident to its rendition of services or protection of rights or property.

47.      The particular ad-serving activity in which Knology participated with NebuAd was a novel ad-serving model, not one in which Knology participated in the normal or necessary conduct of its business. As noted by NebuAd CEO Bob Dykes, NebuAd and its ISP partners adopted this novel model because "ISPs, who have up to now facilitated but barely participated in online advertising opportunities, can open new revenue streams that complement advertiser and publisher objectives to maximize revenue and generate higher revenue-per-subscriber." *Behavorial Insider*, Nov. 14, 2007, *http://publications.mediapost.com/index.cfm?fuseaction=Articles.showArticle&art_aid=71020*. Therefore, Knology's and NebuAd's collaboration was motivated by the money-making potential of combining Knology's unique access to its Users' communications combined with NebuAd's technology and business relationships—not to provide Knology Users the Internet services to which they had subscribed.

48.      Knology's use of the Appliances and deep packet inspection technology was not in Knology's normal course of business or a necessary incident to its rendition of services or protection of its rights or property. In the normal course of an ISP's business and as a necessary incident to its need to protect its customers and network resources and to maintain the availability of its services, an ISP may indeed use tools that employ DPI. For example, an ISP may use DPI

tools to scan Internet communications for data content that matches recognized types of security threats, such as malicious viruses and worms.

49.    In contrast, Knology subjected Users' communications to deep packet inspection to identify users, monitor and track their Internet activity, alter the content of their communications, and forge communications characteristics that bypassed Users' security and privacy controls and bugged their personal computers. Knology used DPI for its own commercial gain, independent of any normal and necessary activity in providing Internet services to Users, preserving its rights, or protecting its property.

50.    The Appliance was spyware[3] in that it caused and enabled the surreptitious tracking of Users' Internet activity and transmittal of code that affected Users' control of their personal computers. However, unlike traditional spyware, which is installed on a user's computers, the Appliance represented a new breed of ISP-hosted spyware.

51.    The Appliance was adware[4] in that it caused the display of advertisements to computer users, and which advertisements were other than those authorized by the publishers of the

---

[3] "*Spyware*" has been defined as

> any type of software that is surreptitiously installed on a computer and, without the consent of the user, could collect information from a computer, could allow third parties to control remotely the use of a computer, or could facilitate botnet communications.

*FTC v. Pricewert*, Case. No. C-09-2407 (RMW) (N.D. Cal.), Order Appointing Temporary Receiver, June 15, 2009 (Dkt. 38).

[4] "Adware" has been defined as:

> any downloadable software program that displays advertisements to a computer user, including, but not limited to, programs that display pop-up or pop-under advertisements, redirect website or search requests, install toolbars onto Internet browsers or electronic mail clients, or highlight particular keywords or phrases for Internet users as they surf the web.

*In the Matter of Priceline.com Incorporated*, Assurance of Discontinuance, Attorney General of the State of New York, Jan. 29, 2007, p. 1, *http://www.oag.state.ny.us/media_center/2007/jan/adware-scannedAODs.pdf.*

web pages downloaded by users. Again, unlike traditional adware, the ISP-hosted location of the Appliances represented an adware innovation.

52.    Knology was an adware marketing partner[5] in that Knology's installation of the Appliances caused the display of advertisements through adware.

53.    Spyware and adware hosting and execution and serving as NebuAd's adware marketing partner were not in Knology's ordinary course of business, were not necessarily incident to Knology's rendition of Internet connectivity services, and were not necessarily incident to Knology's protection of rights and property.

**E.    Knology's Deception and Lack of Authorization**

54.    For at least one month, as Knology deployed the Appliance on a region-by-region basis, Knology did not provide its Users with any notice regarding its relationship with NebuAd. Only after the Appliance was active for over one month did Knology update certain passive notice mechanisms, such as its privacy policy and terms of service. The updates still did not accurately reflect the scope of the infiltration. Finally, approximately two months after Knology had deployed the Appliances in all its networks, it provided Users with some information via letter and e-mail.

55.    When it modified its Customer Service Agreement, Knology still misrepresented to Users that the information shared with NebuAd would "not include those users' name, email address, telephone number, or any other personally identifiable information." "

56.    At no time did Knology disclose that it was intercepting and funneling all User communications to NebuAd, including Users' personally identifiable information; enabling a

---

[5] "Adware marketing partner" has been defined as "any adware company, ad buyer, affiliate, third party distribution partner or other entity that arranges for, purchases, places, or installs the adware program that displays advertising of the products or services . . . through adware." *Id.*

third party to track and profile individually identified Users, anytime and anywhere, and forge communications being transmitted to them; delivering altered and forged communications that affected the integrity, performance, and operations of Users' personal computers. Further, Knology failed to disclose that the opt-out it offered users only affected whether Users saw ads delivered by NebuAd but did not alter the fact that Knology continued its wholesale interception and diversion of traffic to NebuAd. Therefore, Knology's notices were misleading, deceptive, and constituted material omissions.

57.    In the case of the NebuAd Ultra-Transparent Appliance, "transparent" meant operating in a manner designed to be invisible and undetectable to both of the authorized parties to an electronic communication. Users had no reasonable means by which they would have become aware that Knology was diverting their communications to NebuAd.

58.    Accordingly, Users received no notice and at some later time, inadequate notice of Knology's conduct alleged in this complaint, and consequently, Knology could not have obtained any User consent.

## F.    User Consequences

59.    Knology's interception and inspection of Users' electronic communications and its monitoring of identified Users constituted invasions of Users' privacy by intruding upon the solitude and seclusion of Users' private affairs:

a.    Knology's job as an ISP was to provide a secure and confidential conduit for Users' Internet communications, through connectivity services in which in-transit communications are ordinarily transmitted in solitude and seclusion and not ordinarily displayed or available to the general public or third parties.

b.      Users' Internet communications were confidential communications intended for receipt by particular recipients that did not include Knology and NebuAd and, as such, were private affairs of Users.

c.      Users' ability to engage in Internet communications in solitude and seclusion were private affairs of Users.

d.      Users paid Knology for its services and entrusted Knology with all their Internet communications—and the communications of Users who were their family members—with the material expectation that Knology would provide a connectivity setting that would preserve the privacy of their communications, free from unauthorized and improper interception and inspection.

e.      Knology had a duty to Users to hold as confidential all information imparted by and linked to individual Users through their communications and Internet navigation.

f.      Knology invaded Users' privacy by intruding upon the solitude and seclusion of their communications when it caused Users' Internet communications to be intercepted, diverted to a third party, read and analyzed, and used for individual profiling.

g.      Knology perpetrated its intrusions surreptitiously, installing technology designed to escape user detection, and further hid its intrusions by issuing deceptive and misleading statements to Users and to a Congressional committee inquiring into the privacy consequences of Knology's relationship with NebuAd.

h.      Knology used Users' communications for commercial purposes other than the purposes for which Users' had entrusted those communications to Knology.

i.      The degree of Knology's intrusions encompassed the entire scope of Users' communications, including personal and confidential content and communications to and

from minors; all communications types, including HTTPS, web mail, and VoIP traffic; the entire scope of Users' Internet navigation activity; the entirety of Knology's User base; a duration of at least several months; and many millions of User communications.

　　　j.　　Knology's motive was to make money by exploiting the trusted role through which it had access to Users' communications.

　　　k.　　Knology's intrusions continue to affect Users in that their personal information continues to be retained in identity-linked behavioral profiles stored on NebuAd servers.

　　　l.　　Therefore—in light of Knology's breach of trust in its role as a provider of confidential communications transmittal; Users' expectations in their ability to use Knology's services to communicate privately; Users' expectations in the privacy and confidentiality of the particular communications they exchanged over connections provided by Knology; Knology's surreptitious and deceptive conduct and representations in carrying out its intrusions; Knology's selfish motives and willingness to exploit its relationships with Users and betray their privacy interests for its own gain; and the scope and scale of Knology's intrusions—Knology's invasions of its Users' privacy by intruding upon the solitude and seclusion of their Internet communications would be highly offensive and objectionable to a reasonable person.

　　60.　　Further, Knology's tampering with Users' electronic communications and personal computers constituted intrusions upon the solitude and seclusion of Users' private affairs that would be highly offensive and objectionable to a reasonable person for reasons cited above and in that:

　　　a.　　Knology had a duty to Users to hold as confidential all information imparted by and linked to individual Users through their communications and Internet navigation, and its duty of confidentiality include a duty to safeguard the integrity of those communications.

b.      Knology invaded Users' privacy by intruding upon the solitude and seclusion of their communications when it caused Users' Internet communications to be altered, loaded with computer-affecting code designed to facilitate tracking and defeat Users' privacy controls, and affixed with forged origin information designed to defeat Users' security controls.

c.      Users expected to be protected in the solitude and seclusion of their communications, and they expected their communications to remain unmolested by the message carrier to whom they had entrusted their Internet communications.

d.      Knology's intrusions in tampering with Users' communications and computers extended to all Users to whom it provided services and its tampering with computers extended to the personal computers of all Users to whom it provided services.

e.      Therefore, Knology's conduct in tampering with Users' communications and personal computers constituted intrusions upon the solitude and seclusion of Users' private affairs, including the privacy and integrity of their communications and personal computers, that were detrimental to Users' interests and that would be highly offensive and objectionable to a reasonable person.

61.     Knology's conduct alleged in this complaint constituted an ongoing course of conduct that harmed Users and caused them to incur financial losses, in that:

a.      Knology, which was compensated by NebuAd for its performance under the Knology-NebuAd agreement, realized significant economic benefits from the interception and modification of communications that belonged to Users and to which Users enjoyed a superior right of ownership.

b.      As a carrier of messages with no authority to engage in the activities for which NebuAd compensated Knology, Knology appropriated compensation to itself for access to

Users' information, communications, and personal computers when such compensation rightfully belonged to Users.

c.      Knology did so through a novel technology and business model that it implemented in a surreptitious manner and without adequate notice, intentionally deceiving and misleading Users in order to deprive them of the opportunity to realize the economic benefits flowing from the use of their information and computers.

d.      Therefore, Knology was unjustly enriched, and Users are entitled to compensation paid or owed to Knology by NebuAd, or a just and fair portion of such compensation.

e.      Further, the diminution in the performance levels of Knology's services caused by its deployment of the Appliances deprived Users of the utility and quality of service for which they had paid Knology, and Users therefore did not receive the full value of paid-for service.

f.      Further, the invasions of privacy perpetrated by Knology in providing its services deprived users of the quality and character of service for which they had paid Knology, and Users therefore did not receive the fair value of paid-for service.

g.      Further, each deployment of an Appliance on one of Knology's network segments constituted a single act that caused an aggregated loss of at least $5,000 within a one-year period to each group of Users affected by each Appliance.

62.      In Knology's conduct alleged above, including the allegations of section C, "Tampering with User Communications and Computers," Knology's tampering with Users' personal computers and Internet communications caused damage to Users in that:

a.    Knology's interception and processing of intercepted communications consumed resources of and diminished the quality and performance of its Internet connectivity services to users.

b.    Knology's alterations and forgeries of communications diminished the utility, integrity, and value of such communications.

c.    The cookie-creating code Knology transmitted to Users' computers diminished the performance, utility, value, performance, and capabilities of Users' computers.

d.    The cookie-creating code and communications with forged origins Knology transmitted to Users' computers controlled and altered the functioning of Users' computers, including by circumventing Users' security and privacy controls.

e.    Knology's actions caused Users to expend money, time, and resources investigating and attempting to mitigate their personal computers' diminished performance and investigating and attempting to remove the persistently recurring and unauthorized third-party tracking cookies installed on their computers without notice or consent; and, in the process, diminished Users' productivity.

f.    Further, these actions interfered with, diminished, and devalued Users' possessory interests in their personal computers and Internet communications, infringed on Users' right to exclude others from unauthorized access to their personal computers, and compromised the integrity and ownership of Users' personal computers.

g.    Therefore, Users were economically damaged by Knology's conduct.

63.    Knology's conduct alleged above, including that alleged in section C, "Tampering with User Communications and Computers," constituted interference with and intermeddling with Users' personal property in that:

a.    Users' personal computers were their personal property.

b.    Users' Internet communications were their personal property and property in which Users' rights of possession were superior to Knology's.

c.    Users' personal computers were designed to be capable of connecting to the Internet, which connection Knology provided by means of its networks linked to cable modems installed in Users' homes and connected to Users' personal computers, and for which services and equipment Users paid fees to Knology.

d.    Through Knology's interception, alteration, and forgery of communications, Knology accessed and obtained control over communications sent from User's computers to other Internet-connected parties and those parties' responses.

e.    Through Knology's interception and diversion of communications and through its transmission of commands and codes that caused the creation of unusual and persistent cookies, Knology diminished the utility, value, speed, and capacity of Users' personal computers.

f.    Through Knology's forgery of communications components, Knology disabled and nullified the utility of security detection controls and privacy management tools on Users' personal computers, altering and commandeering control of the functioning of Users' personal computers, diminishing the capabilities of Users' personal computers, and compromising the privacy, security, and integrity of Users' personal computers.

g.    Further, the consequences of this conduct were devaluations of Users' personal computers and Internet communications; interference with Users' possessory interests in their personal computers and Internet communications; and diminutions in Users' productivity in using their personal computers and Internet communications.

h.    Knology's conduct was unauthorized and in excess of its authority to transmit Users' Internet communications.

i.    Therefore, Knology, without Users' consent, interfered with and intermeddled with Users' personal computers and Internet communications, harming Users' personal property and diminishing its value, quality, condition, and utility, and causing real and substantial damage to Users, including the damages alleged above.

64.    Knology's conduct alleged in this section F was knowing and intentional and Knology intended the natural and probable consequences of its acts and omissions.

## CLASS ALLEGATIONS

65.    Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and the following Class:

> All individuals who were users of Knology Internet services and whose Internet communications traversing Knology's Internet services network were diverted to a NebuAd Appliance.

66.    Plaintiff reserves the right to revise this definition of the Class based on facts he learns during discovery.

67.    Excluded from the Class are: (i) any Judge or Magistrate presiding over this action, and the court personnel supporting the Judge or Magistrate presiding over this action, and members of their respective families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which a Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; and (iv) the legal representatives, successors, or assigns of any such excluded persons.

68.    *Numerosity*: Individual joinder of all members of the Class is impracticable. The Class includes thousands of individuals. Upon information and belief, Class Members can be identified through the electronic records of Defendant.

69.    Class Commonality: Common questions of fact and law exist as to all Class Members and predominate over questions affecting only individual Class Members. All Class Members were Users of Knology during the time that Knology engaged in the activities alleged in this complaint. All Class Members' Internet communications were diverted, monitored, intercepted, disclosed, divulged, accessed, copied, retained, inspected, analyzed, tampered with, modified, altered, forged, and/or used by Defendant. Common questions for the Class include:

a.    how many Users and User communications were the subject of Knology's conduct herein alleged;

b.    what Internet communications protocol types were affected by Knology's conduct herein alleged;

c.    what personally identifying information was included in the intercepted communications;

d.    how intercepted communications were used;

e.    aside from intercepted communications traffic, what User registration, billing, or other User information was disclosed to NebuAd by Knology;

f.    what effect deployment of the Appliances had on Knology's service levels;

g.    what authority Knology had to engage in its uses of Users' electronic communications in the context of its deployment of the Appliances and its relationship with NebuAd;

h.    what User information collected by or as a result of use of the Appliances continues to be retained by Knology and/or NebuAd;

i.    whether Knology tortiously intruded upon Users' seclusion and solitude;

j.    whether Knology tortiously and unjustly enriched itself;

k.    whether Knology violated the Wiretap Act, Title 18, United States Code, Section 2510, et seq.;

27

l.    whether Knology violated the Computer Fraud and Abuse Act, Title 18, United States Code, Section 1030, et seq.

m.    whether Knology tortiously trespassed upon Users' personal computers;

n.    whether Plaintiff and Class Members are entitled to damages, injunctive relief, and other equitable relief as a result of the consequences of Knology's conduct; and

o.    if so, what is the measure of those damages and the nature of injunctive and other equitable relief.

70.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison to the numerous common questions that dominate.

71.    The injuries sustained by the Class Members flow, in each instance, from a common nucleus of operative facts. In each case, without authorization, through an ongoing, routinized, and common course of conduct, Knology deployed the Appliances and caused Class Members' communications to be intercepted; caused Class Members to be monitored, identified, and tracked in their Internet activity; invaded Class Members' privacy; and tampered with their communications and personal computers.

72.    *Typicality*: Plaintiff's claims are typical of the claims of other members of the Class, as the Plaintiff and other Class Members were all subjected to Defendant's identical wrongful conduct based upon the same transactions which occurred uniformly in regards to the Plaintiff and to the Class.

73.    *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is familiar with the basic facts that form the bases of the proposed Class Members' claims. Plaintiff's interests do not conflict with the interests of the other Class Members that they seek to represent. Plaintiff has retained counsel competent and experienced in class action litiga-

tion and intends to prosecute this action vigorously. Plaintiff's counsel has successfully prose-

cuted complex actions including consumer protection class actions. Plaintiff and Plaintiff's coun-

sel will fairly and adequately protect the interests of the Class Members.

74.    *Superiority*: The class action device is superior to other available means for the

fair and efficient adjudication of the claims of Plaintiff and the proposed Class Members. The re-

lief sought per individual member of the Class is small given the burden and expense of individ-

ual prosecution of the potentially extensive litigation necessitated by the conduct of Defendant.

Furthermore, it would be virtually impossible for the Class Members to seek redress on an indi-

vidual basis. Even if the Class Members, themselves, could afford such individual litigation, the

court system could not.

75.    Individual litigation of the legal and factual issues raised by the conduct of De-

fendant would increase delay and expense to all parties and to the court system. The class action

device presents far fewer management difficulties and provides the benefits of a single, uniform

adjudication, economies of scale and comprehensive supervision by a single court.

76.    Given the similar nature of the Class Members' claims and the material similarity

in the state statutes and common laws upon which the Class Members' claims are based, a na-

tionwide class will be easily managed by the Court and the parties.

77.    In the alternative, the Class may be certified because:

a.    the prosecution of separate actions by the individual members of the Class

would create a risk of inconsistent or varying adjudications with respect to individual Class

Members, which would establish incompatible standards of conduct by Defendant;

b.    the prosecution of separate actions by individual Class Members would

create a risk of adjudications with respect to them which would, as a practical matter, be disposi-

tive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede other Class Members' their ability to protect their interests; and

        c.     Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

### COUNT I
**(Invasion of Privacy by Intrusion Upon Seclusion: On Behalf of the Class)**

78.    Plaintiff incorporates the above allegations as if fully set forth herein.

79.    Defendant's interception and inspection of Users' Internet communications and its identification and monitoring of individual Users, as alleged above, including the allegations in section F, "User Consequences," constituted tortious invasion of privacy by its intrusion upon the solitude and seclusion of Users' private affairs that would be highly offensive and objectionable to a reasonable person.

80.    Defendant's tampering with Users' communications and personal computers as alleged above, including the allegations in section F, "User Consequences," constituted tortious invasion of privacy by its intrusion upon the solitude and seclusion of Users' private affairs that would be highly offensive and objectionable to a reasonable person.

81.    Plaintiff and Class Members were harmed in the loss of the seclusion and solitude in their ability to communicate via the Internet and the seclusion and solitude of their Internet communications, and of which harm Defendant was the cause.

82.    Accordingly, for Defendant's invasions of privacy by its intrusion upon Plaintiff's and Class Members' solitude and seclusion, Plaintiff and Class Members seek the injunctive relief of an order requiring Defendant to cease and refrain from resuming such conduct; the equitable relief of an accounting of the precise nature, duration, and extent of Defendant's intrusion;

such other equitable or declaratory relief as may be just and proper; and all such other relief as the Court may deem just and proper.

## COUNT II
### (Unjust Enrichment)

83.    Plaintiff incorporates the above allegations as if fully set forth herein.

84.    Plaintiff asserts this claim against Defendant on behalf of himself and the Class.

85.    As alleged above, including the allegations in section F, "User Consequences," Plaintiff and the Class have conferred a benefit upon Defendant through the Internet communications of Plaintiff and the Class and the information conveyed in those communications that were private, confidential, and not of public record, and from which information Defendant benefited by deriving revenue based on the value of the communications and information.

86.    In addition, Plaintiff and the Class have conferred a benefit upon Defendant through its access to operation of their personal computers, which were private affairs, and from which Defendant benefited by deriving revenue based on the value of the access to those personal computers.

87.    In addition, Defendant benefited by receiving revenue from subscription fees paid to Defendant for services of a particular character of trustworthiness, integrity, and confidentiality, and which Defendant failed to provide.

88.    Defendant appreciates and has knowledge of these benefits.

89.    Under principles of equity and good conscience, Defendant should not be permitted to retain the revenues it acquired through its unlawful conduct. All funds, revenues, and benefits Defendant has unjustly received through its conduct rightfully belong to Plaintiffs and the Class.

90.    Accordingly, for Defendant's unjust enrichment, Plaintiff and the Class seek to re-cover from Defendant its unjustly received revenue, such other preliminary and other equitable or declaratory relief as may be just and proper, and all such other relief as the Court may deem just and proper.

## COUNT III
### (Violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*: On Behalf of the Class)

91.    Plaintiff incorporates the above allegations as if fully set forth herein.

92.    Defendant's conduct, including that alleged in section A, "Knology's Deployment of Appliances" and section B, "Interception and Use of Personally Identifiable Information," above, was in violation of Title 18, United States Code, Section 2511(1)(a) because Defendant intentionally intercepted and endeavored to intercept Plaintiff's and Class Members' electronic communications and procured NebuAd to intercept and endeavor to intercept Plaintiff's and Class Members' electronic communications.

93.    Defendant's conduct, including that alleged in section A, " Knology's Deploy-ment of Appliances" and section B, "Interception and Use of Personally Identifiable Informa-tion," above, was in violation of Title 18, United States Code, Section 2511(1)(d) in that Defen-dant used and endeavored to use the contents of Plaintiff's and Class Members' electronic com-munications, knowing and having reason to know that the information was obtain through inter-ception in violation of Title 18, United States Code Section 2511(1).

94.    Through Defendant's interception, endeavoring to intercept, use, and endeavoring to use Class Members' electronic communications, their electronic communications were in fact intercepted and intentional used in violation of Title 18, United States Code, Chapter 119. Ac-cordingly, Class Members are entitled to:

a.    such preliminary and other equitable or declaratory relief as may be just and proper;

b.    damages computed as the greater of (i) the sum of the actual damages suffered by Plaintiff and Class Members plus Defendant's profits made through the violative conduct alleged in this complaint; (ii) statutory damages for each Class Member of $100 a day for each day of violation; or (iii) statutory damages of $10,000 per User;

c.    punitive damages; and

d.    reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT IV
### (Violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*: On Behalf of the Class)

95.    Plaintiff incorporates the above allegations as if fully set forth herein.

96.    Defendant's conduct, including that alleged in section C, "Tampering with User Communications and Computers" and section F, "User Consequences," above, was in violation of Title 18, United States Code, Section 1030, *et seq.*

97.    Specifically, Defendant's conduct was in violation of Title 18, United States Code, Section 1030(a)(2)(A) in that Defendant intentionally accessed computers without authorization and exceeded authorized access and thereby obtained information that, as alleged above, consisted of and included the financial records of financial institutions; of card issuers, as defined in Title 15, United States Code, Section 1602(n); and from the files of consumer reporting agencies on consumers, as defined in the Fair Credit Reporting Act, Title 15, United States Code, Section 1681, *et seq.*

98.    Defendant's conduct was in violation of Title 18, United States Code, Section 1030(a)(5)(A) in that Defendant knowingly caused the transmission of programs, information,

codes, or commands, and as a result of such conduct, intentionally and recklessly caused damage, without authorization, to protected computers and, as a result of such conduct, caused damage and loss.

99. Defendant's conduct was in violation of Title 18, United States Code, Section 1030(a)(5)(B) in that Defendant intentionally accessed protected computers without authorization, and as a result of such conduct, recklessly caused damage, and such damage resulted in an aggregated loss of at least $5,000 within a one-year period to each group of Plaintiff and Class Members affected by each Appliance.

100. Defendant's conduct was in violation of Title 18, United States Code, Section 1030(a)(5)(C) in that Defendant intentionally accessed protected computers without authorization, and as a result of such conduct, caused damage and loss.

101. Accordingly, for Defendant's conduct in violation of the Computer Fraud and Abuse Act, Plaintiff and Class Members are entitled to compensation for Plaintiff's and Class Members' economic damages and such injunctive and other equitable relief as may be just and proper.

### COUNT V
### (Trespass to Chattels: On Behalf of the Class)

102. Plaintiff incorporates the above allegations as if fully set forth herein.

103. The common law prohibits the intentional intermeddling with personal property, including a computer in another's possession, which results in the deprivation of the use of the personal property or impairment of the condition, quality, or usefulness of the personal property.

104. Defendant, in its conduct alleged in this complaint, including the allegations of paragraph 63 in section F, "User Consequences," Defendant, in a relationship as a paid Internet service provider to Plaintiff and Class Members and without authority or consent, interfered with

and intermeddled with Plaintiff's and Class Members' personal computers and Internet communications.

105.    Defendant's conduct harmed Plaintiff's and Class Members' personal property and diminished its value, quality, condition, and utility, and causing real and substantial damage to Plaintiff and Class Members.

106.    Defendant's acts constituted repeated and persistent trespass, nuisance, and intentional interference with Plaintiff's and Class Members' use and enjoyment of their computers and communications, in violation of common law.

107.    Plaintiff, on behalf of themselves and the Class, seek injunctive relief restraining Defendant from trespass to chattels, an award of damages to be determined at trial, and such other and further relief as the Court may deem just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following:

(a)    with respect to all counts, declaring the action to be a proper class action and designating Plaintiff and their counsel as representatives of the Class;

(b)    as applicable to the Class *mutatis mutandis*, awarding injunctive and equitable relief including, *inter alia*:

    (i)    prohibiting Defendant from engaging in the acts alleged above;

    (ii)    requiring Defendant to disgorge all its ill-gotten gains to Plaintiff and the other Class Members, or to whomever the Court deems appropriate;

    (iii)    requiring Defendant to delete all data wrongfully collected and retained through the acts alleged above;

    (iv)    requiring Defendant to provide Plaintiff and the other Class Members a reasonably clear, conspicuous, effective, and permanent means to decline to participate in any data collection activities by means of the Appliances and any similar devices, in any present or future iteration, whether connected to NebuAd or any other third party;

(v) awarding Plaintiff and Class Members full restitution of all benefits wrongfully acquired by Defendant by means of the wrongful conduct alleged in this complaint; and

(vi) ordering an accounting and constructive trust imposed on the data, funds, and other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and concealment of such assets by Defendant;

(c) for a preliminary and permanent injunction restraining Defendant and Defendant's officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them from:

(i) transmitting any information about Plaintiff's or Class Members' activities on the internet for advertising purposes to any other websites, without fair, clear and conspicuous notice of the intent to transmit information, including a full description of all information potentially and/or actually available for transmission;

(ii) transmitting any information about Plaintiff's or Class Members' activities on the internet for advertising purposes to any other websites, without fair, clear and conspicuous opportunity to decline the transmittal prior to any transmission of data or information;

(d) awarding damages, including statutory damages where applicable, to the Class in an amount to be determined at trial;

(e) awarding Plaintiff reasonable attorney's fees and costs;

(f) awarding pre- and post-judgment interest; and

(g) granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff requests trial by jury of all claims that may be so tried.

Dated: February 2nd, 2010

Respectfully submitted,

ANDREW PAUL MANARD, individu-
ally and on behalf of all others similarly
situated

By: _____

Russell Deutschman, Esq.
Ga. Bar No.: 219660
Kenneth S. Nugent, P.C.
4227 Pleasant Hill Road
Building 11, Suite 300
Duluth, Georgia 30096
Telephone: (404) 885-1983
Facsimile: (678) 957-8657

Of Counsel:

SCOTT A. KAMBER
skamber@kamberlaw.com
DAVID A. STAMPLEY
dstampley@kamberlaw.com
KAMBERLAW, LLC
11 Broadway, Suite 2200
New York, New York 10004
Telephone: (212) 920-3071
Facsimile: (212) 920-3081

BRIAN J. PANISH
panish@psblaw.com
RAHUL RAVIPUDI
ravipudi@psblaw.com
PANISH, SHEA & BOYLE, LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
Telephone: (310) 477-1700
Facsimile: (310) 477-1699

JOSEPH H. MALLEY
malleylaw@gmail.com
LAW OFFICE OF JOSEPH H. MALLEY, P.C.
1045 North Zang Boulevard
Dallas, Texas 75208
Telephone: (214) 943-6100
Facsimile: (214) 943-6170

DAVID C. PARISI
dcparisi@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone:  (818) 990-1299
Facsimile:   (818) 501-7852